# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> v. <br> CANDY LYNN BISSO, | **Case No.: 6:17-mj-00009-MJS-1** <br><br> **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** <br><br> **(ECF No. 13)** |

This matter comes before the Court on Defendant's motion to suppress evidence seized in the course of a stop and arrest of Defendant in Yosemite National Park on November 2, 2016. For the reasons stated below, the motion will be denied.

## I. Procedural Background

Defendant is charged with three counts in a January 27, 2017 criminal complaint. Count 1 alleges that she was carrying or storing an open container of alcohol within a motor vehicle in violation of 36 C.F.R. 4.14(b). Count 2 alleges that she failed to comply with the directions of a traffic control device in violation of 36 C.F.R. 4.12. Count 3 alleges possession of marijuana, a controlled substance, in violation of 36 C.F.R. 2.35(b)(2). (ECF No. 1.)

Defendant made her initial appearance on March 22, 2017, and the Federal Defender was appointed to represent her. (ECF No. 8.) Defendant pled not guilty to all charges. (ECF No. 11.)

On July 11, 2017, the Court accepted and approved defense counsel's request to set a schedule for filing, briefing, and hearing Defendant's proposed motion to suppress.

(ECF No. 12.) The motion was filed August 14, 2017, opposed by the United States on September 14, 2017, and ultimately set for an evidentiary hearing on October 19, 2017.

At the October 19, 2017 hearing, testimony was taken from the two law enforcement rangers involved at various times in the stop and arrest of Defendant. The Government submitted, and the Court admitted, into evidence two segments of video -- body camera footage from the two Rangers -- without objection by defense counsel. Defendant was not present or otherwise available for examination.

**II.    Relevant Facts**

The following facts are relevant and, for purposes of this motion, undisputed except as may otherwise be indicated:

On the evening of November 2, 2016, Ranger Justin Fey was on patrol investigating a report of a stolen license plate near the Majestic (aka Ahwahnee) Hotel in Yosemite National Park. At approximately 8:10 PM, Ranger Fey observed "two people turn and walk away from him as soon as they saw him" and "get inside a dark colored Ford pickup and [drive] away from the parking area," allegedly failing to use a left turn signal on exiting the parking lot. Ranger Fey radioed this information to Rangers Jesse McGahey and Lisa Kahn, who began following the pickup. According to Ranger McGahey's written report, he then observed the following from behind the pickup,:

> At the Camp 6 intersection we observed the pickup fail to come to a complete stop at the stop sign. We continued to follow the vehicle as it turned left on Northside Drive towards Half Dome Village. At Curry 4-way the pickup turned left on Southside Drive. The pickup turned on the right hand turn signal before Curry 3- way. The pickup slowed, but did not turn right onto Curry Village drive and continued heading straight. The driver then turned off the right turn signal. The driver then turned back on the right hand turn signal at Pentilla's corner, at a location where it is not possible to turn right. The pickup stopped and then turned left, and subsequently turned right into Upper Pines. Near the kiosk the pickup attempted to U-turn and we stopped the vehicle at the Dump Station pull off at approximately 20:15 hours.

After stopping the vehicle, Ranger McGahey approached the driver of the vehicle and identified her by her driver's license as Defendant Candy Bisso. While Defendant

1  was retrieving her license and registration, Ranger McGahey commented that Defendant
2  had been driving "a little erratically," to which Defendant responded[1] that she had been
3  having trouble seeing (dark night, foggy windows, glare from car behind her, new road
4  construction) and, being unfamiliar with Yosemite Valley, was trying to follow directions
5  from her passenger – a new park employee – who was trying to locate her new housing
6  but was lost. When asked if she had had anything to drink, Defendant indicated that she
7  had had a beer approximately two and a half hours earlier. Later she said she only drank
8  part of that beer as it was pale ale, and she did not like pale ale.

9  After obtaining Defendant's license and registration, Ranger McGahey returned to
10 his vehicle and spoke with Ranger Fey. Ranger McGahey acknowledged that he had not
11 seen a license plate in the car and had not seen or smelled any alcohol or drugs.
12 However, he observed that Defendant was "fiddling around with stuff", that is, she had a
13 poor grip on her registration and dropped it, and she seemed to have difficulty
14 "multitasking", getting her registration while talking to the ranger.[2] Ranger McGahey felt
15 that Defendant was "a little off" and that her comments, such as about the beer,
16 "[s]ounds a little questionable." He observed that Defendant's actions and responses
17 were "good enough" to justify a field sobriety test if Plaintiff consented. Defendant's
18 license check came back valid and no outstanding warrants were found.

19 Ranger McGahey then returned to Defendant's car and asked her to undergo a
20 series of Field Sobriety Tests ("FSTs"). Defendant consented. In response to
21 questioning, Defendant noted that that she had earlier that day been knocked down
22 when she hit her head on an open SUV cargo door and that the incident had left a bump
23 on her head. She also noted that she had not eaten anything since lunch,

24 For approximately fifteen minutes, Defendant underwent FSTs consisting of
25 horizontal gaze nystagmus (HGN), walk and turn, and one-legged stand testing. The

---

[1] Some of these responses may have come later in the stop
[2] At the hearing Ranger McGahey acknowledged that many, if not most, people appear nervous when confronted by law enforcement at a traffic stop and that Defendant's reaction might have been attributable to such nervousness.

3

HGN did not suggest impairment, but the other two tests were interpreted as being positive for impairment. Ranger McGahey characterized Defendant's performance of the walk and turn test as the worst he had ever seen. Defendant acknowledged performing horribly on the FSTs, noting that she was not very good at such things, and asked if she could just take a Breathalyzer test.

While Ranger McGahey was administering the FSTs, Ranger Fey was speaking to Defendant's passenger and noticed, when she opened her purse, that there was a dispenser of Visine eye drops on the top of the contents of her purse, as if it had been the last thing put away. According to Ranger Fey's training and experience, people often use Visine to hide bloodshot eyes caused by drinking or drugs. When asked, the passenger said she, not the driver, had used the Visine because she had a sty. Later, Defendant said she had used the drops herself that evening.

Ranger McGahey had Defendant undergo a preliminary/non-evidentiary Breathalyzer test. It produced a reading of .056, below the presumptively intoxicated level of .08, but, according to Ranger McGahey, more than would be expected from the consumption of less than one beer two and one half hours earlier.

Once Defendant returned to her vehicle, McGahey and Fey discussed in private their observations, to include the abnormal FSTs, the "lying" about Visine ("well, maybe not lying"), and the Breathalyzer results. Their comments included: "It might be worth digging to see if there is something else "on board"; "I want to get in the vehicle"; I feel like there is a good chance that there is something else going on."

Ranger McGahey then elected to "see if they'll give me consent to look in the vehicle." He lamented that he had not done the other tests while she was out there, the Romberg and lack of convergence."[3]

At this point, Ranger McGahey returned to the driver's side of the vehicle to talk to

---

[3] Additional field tests for impairment, including impairment by drugs. Ranger McGahey later testified he did not administer them because, though trained, he had never given them himself in the field and did not feel confident enough to do so at the time. The Park Service has an officer qualified to do drug impairment testing, but he was "not available" at the time. No such tests or other drug testing were ever done to see if Defendant had drugs in her system.

4

Defendant. He noted what he felt were inconsistencies as regards the amount of alcohol in her system as compared to what she claimed to have drunk, the use of Visine, the poor FST performance, and said he felt that Defendant had not been telling the truth. He then asked: "Have you been smoking anything. Do you have a recommendation for medical marijuana? Do you have anything in the vehicle?" Defendant said she did have a medical marijuana card and did have marijuana in her purse, and offered to produce it for the Ranger. He declined her proffer. The rangers instead commenced a thorough search of the vehicle and its contents. They found 1.5 grams of marijuana where Defendant said it was, in her purse, and an open container of whiskey in the far right side of the truck's rear seat. Defendant was arrested and transported to the Yosemite Holding Facility.

### III. Legal Standard

Defendant challenges the constitutionality of her continued detention after Ranger McGahey conducted the FSTs and Breathalyzer. (ECF No. 13 at 10.) Specifically, Defendant argues that the Breathalyzer result below the legal limit for DUI effectively concluded the rangers' investigation into a possible DUI and there was thereafter no justification for continuing the traffic stop. (Id.) She asks that all evidence taken after the Breathalyzer test was administered be suppressed.

The parties' briefs set forth, without any real dispute, the law applicable to the issues Defendant raises. It is summarized broadly as follows:

"[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." Minnesota v. Dickerson, 508 U.S. 366, 372 (1993) (citations and internal quotation marks omitted). When a defendant moves to suppress evidence, the government bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure falls within one of the delineated exceptions to the warrant requirement. See United States v. Huguez-Ibarra, 954 F.2d 546, 551 (9th Cir. 1992).

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that police may briefly detain a person they reasonably suspect is connected with criminal activity to investigate the circumstances that provoke suspicion. Id. at 27-29. Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). This standard also applies to seizures for traffic violations, because "[a] routine traffic stop . . . is a relatively brief encounter and 'is more analogous to a . . . Terry stop . . . than to a formal arrest.'" Knowles v. Iowa, 525 U.S. 113, 117 (1998) (quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)). As with Terry stops, "[t]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" Berkemer, 468 U.S. at 439 (quoting United States v. Brignoni–Ponce, 422 U.S. 873, 881 (1975)).

Traffic stops are "presumptively temporary and brief." Berkemer, 468 U.S. at 437. "The vast majority of roadside detentions last only a few minutes." Id. The Supreme Court has made clear that traffic stops can last only as long as is reasonably necessary to carry out the "mission" of the stop, unless police have an independent reason to detain the motorist longer. See Rodriguez v. United States, 135 S.Ct. 1609, 1615 (2015). The "mission" of a stop includes "determining whether to issue a traffic ticket" and "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. A stop that is unreasonably prolonged beyond the time needed to perform these tasks ordinarily violates the Constitution. Id. This is so because the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996). The observation of a traffic infraction provides "[a]uthority for the seizure" of the driver only until the "tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 135 S.Ct. at 1614 (citing United States v. Sharpe, 470

U.S. 675, 686 (1985)). Thus, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete" the stop's mission. Id. at 1611 (internal quotation marks omitted).

Within "the time reasonably required to complete" the stop's mission, the Fourth Amendment tolerates investigations that are unrelated to the purpose of the stop and that fall outside the scope of that mission. Id. at 1615. However, the Supreme Court is clear that these "unrelated investigations" are impermissible if they "lengthen the roadside detention." Id. at 1614. Police simply may not perform unrelated investigations that prolong a stop unless they have "independent reasonable suspicion justifying [the] prolongation." United States v. Evans, 786 F.3d 779, 787 (9th Cir. 2015) (citing Rodriguez, 135 S.Ct. at 1612).

Non-routine record checks and dog sniffs are examples of "unrelated investigations" that may not be performed if they prolong a roadside detention absent independent reasonable suspicion. These inquiries "[l]ack the same close connection to roadway safety as the ordinary inquiries." Rodriguez, 135 S.Ct. at 1615. The Ninth Circuit has held that prolonging a traffic stop to perform an ex-felon registration check or a dog sniff is unlawful because these tasks are "aimed at detecting evidence of ordinary criminal wrongdoing" and are not "ordinary inquir[ies] incident to the traffic stop." Evans, 786 F.3d at 788 (original brackets omitted) (quoting Rodriguez, 135 S.Ct. at 1615). "[T]he Government's endeavor to detect crime in general or drug trafficking in particular . . . cannot justify prolonging an ordinary traffic stop . . . ." Id. (internal quotation marks omitted) (quoting Rodriguez, 135 S.Ct. at 1616). "Such on-scene investigation into other crimes detours from an officer's traffic mission." Id.

**IV.  Analysis**

While Ranger McGahey observed and reported several independent moving violations while following Defendant's pickup (including a rolling stop and two traffic signal violations), his stated purpose for stopping Defendant was concern that the driving behavior reflected a possible DUI; concern that Defendant may have been under the

7

influence of alcohol or drugs to a degree that rendered her incapable of safe operation of the vehicle.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez, 135 S.Ct. at 1614. In this instance, Ranger McGahey could extend the duration of the traffic stop as long as reasonably necessary to conduct an investigation into his suspicion that Defendant was driving under the influence. Thus, unlike a stop for only an ordinary traffic violation, Ranger McGahey was entitled to go beyond checking Defendant's paperwork, running her information, and drafting a ticket or warning. Instead, Ranger McGahey could undertake a more substantive investigation into his suspicion of DUI.

Defendant does not dispute that the Rangers had reasonable grounds for stopping her vehicle to investigate the possibility that she had been driving under the influence. Similarly, having consented to the FSTs and the Breathalyzer, she does not dispute that both were reasonable under the circumstances. However, Defendant maintains that reasonable investigation of the suspected DUI ended with Defendant performing below the DUI presumptive limit on the Breathalyzer, showing no clues on the HGN test, and explaining her deficient performance on the FST. Defendant maintains that at that point, the rangers were no longer investigating a DUI but instead had become suspicious that there was "something else on board' and wanted to get inside the car to test their suspicion. Indeed, after the FSTs and Breathalyzer, Ranger McGahey observed to Ranger Fey, that he "feels like there's a good chance that something else is going on," and he wanted to "get into the vehicle."

The government, through the rangers' testimony and argument at the hearing, maintained that the rangers were continuing throughout the stop to investigate a possible DUI whether caused by alcohol or drugs or some combination of the two. They argue, in effect, that each step of the investigation justified the next and ultimately the full search and resulting seizure of Defendant and evidence of violations of the law.

8

From the Courts view the undisputed sequence of events might be perceived in two different, and at least superficially, conflicting ways:

From the law enforcement standpoint, Defendant's failure to comply literally with traffic rules and traffic control devices and erratic use of turn signals justified the initial stop to investigate the possibility Defendant was under the influence of drugs or alcohol or both. As part of their investigation they asked if Plaintiff would consent to FSTs. She did; she did not have to; but she did. She performed poorly enough to justify her being detained further to investigate the cause of the poor performance. She then suggested, and consented to, a Breathalyzer test, which did not show a level of presumed intoxication, but was a result higher than expected from consumption of part of a beer a couple hours earlier, suggesting that perhaps Defendant was being less than honest in her responses and raised the possibility that something other than alcohol accounted for her poor FST performance. Ranger McGahey was thus justified in continuing his investigation into possible intoxication. He did so by asking Plaintiff about marijuana. Once she volunteered that she had marijuana in her possession, the rangers were justified in their search for evidence of drugs in the vehicle. See United States v. Savath, 398 F. App'x 237, 239 (9th Cir. 2010) (admission that the purpose of trip was to consummate a drug deal provided probable cause to believe that evidence of illegal activity would be found in car). Upon finding the marijuana and an open container of alcohol, they were justified in arresting Defendant and charging her with violating regulations prohibiting both in the Park. In that view, the stop, the questioning, the search, and the seizure were all justified under standards established by the U.S. Supreme Court.

On the other hand, one might view the sequence as follows: While no one can seriously doubt the propriety of the original stop and investigation, one can question why the rangers did not seem to give serious consideration to the possibility that the answers and explanations given were consistent with real human experience. Failing to use a turn signal when pulling on to a street from a parking lot apparently is a violation of the

9

law but, as was conceded, not uncommon and certainly not the most egregious crime. A rolling stop is of greater concern, but so common in this state it has its own name: a "California stop".[4] Using turn signals and then not acting in accordance with the signals is problematic, but, as the ranger acknowledged, also consistent with someone being lost. That is precisely the perfectly plausible explanation given by Defendant who also explained that she was having difficulty seeing because she did not have her glasses, the windows were foggy, the car (the ranger's) following her created glare, she was unfamiliar with the area, and her passenger/navigator, was lost. Note too that Defendant's vehicle displayed no evidence of a stolen license plate or other crime. There was no odor of alcohol or marijuana emanating from Defendant or the vehicle. In these absences, certainly the ranger could well have accepted the very plausible explanations and, at most, issued a citation or citations for the driving violations. For some reason he did not. Instead he felt, based upon Defendant fiddling with her registration and license, dropping her registration, having trouble producing the documents while conversing, that she seemed "a little off" to him and he "had enough" to do the FSTs if she consented. Certainly, he could have just as easily and justifiably taken these "signs" as typical of most people who (as the ranger admitted) become nervous when interrogated by a law enforcement officer at a traffic stop. One also might question whether the other "evidence" -- the use of Visine and the failure of the passenger to say that Defendant had used it (whether she knew of such use or not) -- was truly indicative of anything. The rangers nevertheless had a "feeling" that there was something else "on board". He and Fey explained that this was ranger vernacular for whether Defendant had anything "on board her person".  However, to Defendant and, one might expect, to most lay people, this suggests a shift in the Ranger's focus from whether Defendant was under the influence to whether she had contraband in her vehicle. Regardless of the meaning of "on board", Ranger McGahey was explicit in saying he wanted "to get into the vehicle", he wanted to dig deeper because he thought there was a "good chance" that "something

---

[4] Ranger McGahey testified Defendant's failure to stop was worse than the typical "California rolling stop".

else" was going on.

It is not inconsequential that the arrest and search did not produce evidence of "something else" going on. The evidentiary breath test conducted after Defendant's arrest showed no less alcohol (.04) in her system than the field test had. The finding of an open container in the far reaches of the back seat, as far from Defendant as possible and still be in the vehicle, though a crime, is not the evidence Ranger McGahey thought might be present. (There was no evidence presented to suggest Defendant had consumed anything from that container). Granted Plaintiff had marijuana, which she voluntarily produced and for which she had a medical authorization; but such circumstances often result in seizure of the marijuana and nothing more, not even a citation. The rangers arguably were so unconcerned about the possibility of impairment by drugs that they did not subject Defendant to further drug recognition evaluation or blood testing.[5] From what ensued, it would be fair to say that the officer's hunches proved unjustified.

One cannot but be concerned about law enforcement ignoring very plausible explanations for behavior that many would consider marginal at worst and especially doing so based on ill defined "feelings" and intuitions. The prosecutor argued that such feelings were the culmination of all the training and experience the officers brought to bear on the circumstances, and that we must defer to them in that regard. The Court does so defer, but remains concerned, as noted in Court, that the officers, perhaps with the very best of motives and intentions, reached their conclusion that something was amiss based on a hunch, mere speculation, pure suspicion, and then undertook to validate that suspicion. As also noted in Court, it is unlikely that the framers of the Constitution and Bill of Rights anticipated and condoned any such behavior. Acceptance of such reasoning could expose any and all of us to law enforcement examination of every nook and cranny of our vehicles just because we became lost, because we were

---

[5] The unexplained "unavailability" of the Drug Recognition Expert did not explain the decision not to do seek a warrant for blood or other testing for drugs.

11

nervous upon being questioned by one with rather unlimited power over us, and because we used eye freshener.

But, the inquiry here is whether Ranger McGahey was justified under the law in pursuing his investigation as he did and, if so, whether the possibility that he might have had an ulterior motive – to see if Defendant had contraband in her vehicle – vitiated the legality of the investigation and ensuing search and seizure. On review of all of the facts and applicable law, the Court answers the first question in the affirmative and the latter in the negative. The search and seizure were proper under existing law; the motion to suppress must be denied.

The Court finds that Ranger McGahey was justified in pursuing the DUI investigation notwithstanding the FSTs and Breathalyzer results. Ranger McGahey interpreted the FSTs as revealing seven "clues" of possible intoxication,[6] enough to take Defendant into custody and conduct evidentiary tests for intoxicating substances. United States v. Buckner, 179 F.3d 834, 837 (9th Cir.1999) ("[p]robable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime."); United States v. Stanton, 501 F.3d 1093, 1101 (9th Cir. 2007) (even discounting a preliminary, non-evidentiary positive breath test for alcohol, a park ranger had probable cause to arrest based on totality of the circumstances, which included the defendant's "watery and bloodshot eyes, unsteady balance, slow speech, and strong odor of alcohol. She had also observed him fail two FSTs."). See also Perdew v. Valiant, 21 F. App'x 703 (9th Cir. 2001) (probable cause to arrest a suspect for DUI after failing FSTs, even where the defendant tested negative for alcohol in a preliminary breath test

---

[6] According to Ranger McGahey, on the "walk and turn" test, Defendant displayed the following signs of intoxication: (1) She lost balance during the instruction phase; (2) She missed heel-to-toe by more than ½ inch while walking on almost every step; (3) She stepped off line multiple times and veered sharply off to the left; (4) She used her arms to balance, raising them to nearly ninety degrees on several occasions; (5) She turned improperly, stepping off the line and stopping and placing her foot off to the right; and (6) She took the wrong number of steps- seven on the way out and eleven on the way back.
Def. Ex. A (Ranger McGahey's November 7, 2016 report) at 2.

at the scene and, later, in custody, even negative for alcohol and all illicit substances in blood and urine).

While Defendant offered explanations for her poor performance as, one might suspect, most everyone would, her actual performance was in fact poor and an indication of possible drug or alcohol impairment. This alone gave Ranger McGahey probable cause to arrest Defendant for suspicion of DUI.

Furthermore, even if the contrary were true, Ranger McGahey's inquiry concerning possible intoxication was not yet complete. While the Rangers' conversation certainly suggests the possibility of an added, ulterior, and arguably improper motive, for continuing the investigation, i.e., a desire to "get into the car", Ranger McGahey's ensuing line of questioning directly addressed his reasonable suspicion that Defendant was impaired by drugs, alcohol or both. He asked Defendant whether she had marijuana and whether she had a recommendation for medical marijuana. She was not required to answer, but when she responded that she did have a medical recommendation and marijuana in her possession, she opened the door for further investigation (to include a search of every nook and cranny in her vehicle that might conceal illicit drugs, United States v. Wayne, 903 F.2d 1188, 1196 (8th Cir. 1990) ("[C]ocaine itself is easily hidden, and so the warrant would have authorized the officers to search every nook and cranny of the house, including any container in which such a small amount of cocaine could be found.") (internal citations omitted)) and her arrest. See Savath, 398 F. App'x at 239.

Ranger McGahey's line of questioning was an extension of the DUI investigation, which, given FST clues of intoxication, was not yet over. The Breathalyzer results and accumulation of evidence (erratic driving, fiddling with things, dropping the registration, making inconsistent statements, poorly performing the FSTs) indicated that Defendant was under the influence of *something* (i.e., potentially intoxicated by drugs), and justified the Rangers asking her about drugs.

In United States v. Cornejo, a District Judge concluded that a traffic stop was

13

unreasonably prolonged by the officer asking questions unrelated to the traffic stop mission even after determining the motorist's paper work was in order, he did not have any outstanding warrants or weapons and the car was not reported lost or stolen. 196 F.Supp.3d 1137 (E.D. Cal. 2016). The officer suspected the motorist was trafficking drugs and so intentionally prolonged the stop to give a K9 unit time to arrive to check his suspicion. Id. The case turned, however, on the fact that the officer's questions extending the stop did not relate to the act for which the motorist had been stopped -- driving on the shoulder of the road. Id. at 1152. Here, Ranger McGahey had a legitimate basis for continuing in his original mission: to see if Defendant was under the influence of drugs or alcohol or both.

Under those circumstances, it is irrelevant whether Ranger McGahey may have had an ulterior motive for pursing his search. A warranted search is not made illegal by an ulterior motive. See Whren, 517 U.S. at 812-13 ("We flatly dismiss[] the idea that an ulterior motive might serve to strip the agents of their legal justification. . . . [W]e [hold] that a traffic-violation arrest . . . would not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search,' . . . and that a lawful postarrest search of the person would not be rendered invalid by the fact that it was not motivated by the officer-safety concern that justifies such searches.") (internal citations omitted).

**IV.   Order**

For the reasons stated above, Defendant's Motion to Suppress is hereby DENIED. A status conference will be held at 10:00 AM, January 24, 2018, at the Yosemite Courthouse to determine the next steps in the prosecution of this case.

IT IS SO ORDERED.

Dated:   November 15, 2017        /s/ *Michael J. Seng*
                                    UNITED STATES MAGISTRATE JUDGE

14